**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| TIMOTHY J. HARRIS, on behalf of himself and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust, | ) ) ) ) ) ) |
| Petitioner/Plaintiff, | ) ) |
| and | ) ) |
| KRISTEN HARRIS and MEGAN LOEWENBERG, on behalf of themselves and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MARY ELLEN HARRIS, JUDITH LOLLI, CHARLES GRINNELL, ROYCE MANAGEMENT, INC., MICHAEL SCHWAGER and PAUL PETIGROW, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| HARRIS FRC CORPORATION, a New Jersey Corporation, | ) ) ) |
| Respondent, | ) ) |
| and | ) |

C.A. No. 2019-0736-JTL

|                                          | )  |
| ---------------------------------------- | -- |
| HARRIS FRC CORPORATION, a New            | )  |
| Jersey Corporation and THE MARY          | )  |
| ELLEN HARRIS 2011 GRANTOR                | )  |
| RETAINED ANNUITY TRUST,                   | )  |
|                                          | )  |
| Nominal Defendants.                      | )  |

**MEMORANDUM OPINION**

Date Submitted: November 9, 2022
Date Decided: January 16, 2023

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris*.

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, Sewell, New Jersey; Jill Guldin, FISHER BROYLES, LLP, Princeton, New Jersey; *Counsel for Kristen C. Harris and Megan Harris Loewenberg*.

David A. Jenkins, Julie M. O'Dell, SMITH, KATZENSTEIN & JENKINS LLP; Wilmington, Delaware; *Counsel for Mary Ellen Harris*.

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris, Paul Petigrow, and Michael Schwager*.

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Royce Management, Inc., Judith Lolli, and Charles Grinnell*.

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Neal J. Levitsky, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; Emily A. Kaller, GREENBAUM, ROWE, SMITH & DAVIS LLP, Woodbridge, New Jersey; *Counsel for Harris FRC Corporation.*

William M. Kelleher, Phillip A. Giordano, Madeline Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The Mary Ellen Harris 2011 Grantor Retained Annuity Trust*.

**LASTER, V.C.**

Dr. Robert M. Harris, Sr., formed Harris FRC Corporation (the "Company").[1] He and his spouse, Mary Ellen Harris, originally owned all of its 1,000 shares as tenants by the entirety. They gifted 190 shares to their five children (the "Siblings"), and they set up two grantor retained annuity trusts (the "GRATs") to transfer another 490 shares to the Siblings in a tax-advantaged manner. Through these transactions, control over the family-owned entity would pass to the second generation.

The plaintiffs in this action are three of the Siblings. They allege that in 2015, as Dr. Harris's health was failing, Mary Ellen and four of her close friends and advisors schemed to seize control of the Company. After securing control, they engaged in a series of self-dealing transactions that tunneled millions of dollars out of the Company. To perpetuate their control, Mary Ellen and her advisors found ways to negate the distribution of shares from the GRATs.

In this action, the plaintiffs have asserted claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty against Mary Ellen and the advisors based on their self-dealing. They also challenge a merger that Mary Ellen and the advisors effectuated to move the Company from Delaware to New Jersey (the "Outbound Merger"). And they contend that Mary Ellen violated the trust agreement that governed her GRAT

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using first names is confusing because Dr. Robert M. Harris has a son with the same name. This decision therefore refers to the father as "Dr. Harris." That reference is sadly confusing as well, because one of the plaintiffs is Dr. Timothy J. Harris. This decision refers to him as "Tim Harris."

by paying far less than equivalent value to withdraw the 245 shares it held (the "Share Withdrawal"). The plaintiffs contend that the advisors tortiously interfered with the GRAT's trust instrument by helping Mary Ellen complete the Share Withdrawal.

Judith Lolli and Charles Grinnell are two of the advisors. After Mary Ellen gained control of the Company, Lolli and Grinnell formed a shell company called Royce Management, Inc. ("Royce") and entered into an agreement with the Company to provide management services in return for $2.5 million per year. Royce also received large bonuses. Between 2015 and 2020, the Company paid Royce $20 million. Lolli and Grinnell assisted with the schemes to solidify Mary Ellen's control, including the Share Withdrawal.

Lolli, Grinnell, and Royce have moved to dismiss all of the claims against them under Rule 12(b)(2) for lack of personal jurisdiction. The analysis of that issue is affected by a recent decision in this case, which held that the Outbound Merger caused the plaintiffs to lose standing to assert their derivative claims as such. *Harris v. Harris*, 2023 WL 115541, *2 (Del. Ch. Jan. 6, 2023) (the "Standing Decision"). The Standing Decision explained that the plaintiffs could challenge the Outbound Merger directly because of alleged disclosure violations and its evident failure to value the derivative claims. The plaintiffs thus can continue to litigate the derivative claims, but as corporate assets to be valued as part of the challenge to the Outbound Merger, rather than as claims that can support relief in their own right. The Standing Decision did not affect the challenges to the Share Withdrawal.

In light of the Standing Decision, the claims for breach of fiduciary duty and for adding and abetting breaches of fiduciary duty that are currently at issue involve challenges

2

to the Outbound Merger. The court can exercise jurisdiction over Lolli and Grinnell for purposes of those claims. The plaintiffs can effectuate service on Lolli and Grinnell under Delaware's Long-Arm Statute because the Outbound Merger is a Delaware-directed act, and the plaintiffs have alleged facts sufficient to attribute that Delaware directed act to Lolli and Grinnell. At a minimum, the plaintiffs have alleged sufficient facts to obtain jurisdictional discovery, but in this case, jurisdictional discovery is not necessary because the plaintiffs have pointed to facts of record supporting a pleading-stage inference that Lolli and Grinnell have spoliated evidence. Based on the allegations regarding spoliation, the plaintiffs receive a pleading-stage inference that the spoliated evidence would have reinforced the connections between Lolli and Grinnell and the Outbound Merger.

The exercise of personal jurisdiction over Lolli and Grinnell for purposes of challenges to the Outbound Merger is consistent with due process. By participating in the plan to effectuate the Outbound Merger, Lolli and Grinnell purposefully availed themselves of the benefits of Delaware law. It is fair to require Lolli and Grinnell to defend themselves in this court against claims challenging the Outbound Merger.

The same reasoning applies to the exercise of personal jurisdiction over Lolli and Grinnell for purposes of the claim for tortious interference with the trust instrument. The plaintiffs can serve Lolli and Grinnell under Delaware's Long Arm Statute because as a critical step in the Share Withdrawal, Mary Ellen and her advisors moved the situs of the trust to Delaware by replacing its existing trustee with a Delaware trustee. That was a Delaware-directed act. The plaintiffs have alleged facts sufficient to attribute that Delaware directed act to Lolli and Grinnell under the conspiracy theory of jurisdiction, and the court

3

additionally can draw a pleading-stage inference to that effect based on Lolli and Grinnell's spoliation of evidence. By participating in the plan to move Mary Ellen's trust to Delaware and effectuate the Share Withdrawal, Lolli and Grinnell purposefully availed themselves of the benefits of Delaware law. It is fair to require them to defend themselves in this court against a claim for tortious interference based on the Share Withdrawal.

This court can exercise personal jurisdiction over Royce. Lolli and Grinnell are its principals and act on its behalf. Their jurisdictional acts are attributed to Royce.

Lolli, Grinnell, and Royce have separately moved to dismiss under Rule 12(b)(3). They contend that this court is an improper venue for litigation because a forum selection clause in the management services agreement between the Company and Royce governs the plaintiffs' claims. The claims that the plaintiffs assert in this case arise from sources independent of the management services agreement and do not implicate its terms. The forum selection clause is not controlling.

The motions to dismiss that Lolli, Grinnell, and Royce have filed under Rules 12(b)(2) and 12(b)(3) are therefore denied.

## I.    FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' Verified Supplemental and Third Amended Complaint (the "Complaint") and the documents that it incorporates by reference.[2] At this

---

[2] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Christopher M. Foulds, which collects certain documents that are incorporated by reference in the Complaint. Dkt. 467.

4

procedural stage, the plaintiffs are entitled to have the court credit their allegations and draw all reasonable inferences in their favor. For purposes of evaluating whether a defendant is subject to the court's jurisdiction, "the court may go beyond the pleadings and look to affidavits and other discovery of record." *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003). The factual recitation therefore incorporates matters drawn from the parties' submissions in connection with the motions to dismiss.

## A. The Company

Before May 2016, the Company was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation. It is and always has been a family-held entity. Currently, its only stockholders are Mary Ellen, the five Siblings, and various trusts created for their benefit. The plaintiffs in this action are three of the Siblings: Tim Harris, Kristen Harris, and Megan Harris Loewenberg. As discussed below, another Sibling previously sued Mary Ellen and the Company and reached a settlement.

Dr. Harris founded the Company after securing the patent rights for an epilepsy drug. He monetized the patent rights through a license agreement with a global biopharmaceutical company and formed the Company to hold the rights and receive royalty payments. That revenue stream historically amounted to approximately $100 million per year. The Company's only significant function was to collect and distribute the payments. In 2020, the Company sold its patent rights for $342 million in cash. The Company currently holds a pool of cash of around $120 million. It has no operating business.

5

The Company has issued 1,000 shares. Originally, Dr. Harris and Mary Ellen owned all of the shares jointly as tenants by the entireties. In 2002, they transferred 38 shares to each of the Siblings, resulting in each owning a 3.8% interest. In 2011, Dr. Harris and Mary Ellen each created a GRAT and funded it with 245 shares. The GRATs had terms of seven years and would expire on December 31, 2018. At that point, the shares would be distributed to the Siblings. Through the combination of the 190 shares they received directly and the 490 shares distributed from the GRATs, the Siblings would receive a total of 680 shares, representing a controlling 68% interest in the Company.

**B.      Dr. Harris's Illness**

In October 2013, Dr. Harris was diagnosed with an aggressive form of aphasia consistent with Alzheimer's disease. After an MRI, two distinguished specialists at Columbia University confirmed the diagnosis.

As Dr. Harris's health deteriorated, Lolli insinuated herself into Mary Ellen's financial life. Lolli and Mary Ellen are next-door neighbors in Holmdel, New Jersey. They also own adjacent beach houses in Point Pleasant, New Jersey. They are so close that Lolli appears to have spliced Mary Ellen's cable connection and run a cable to her own home. Phone logs show that Mary Ellen and Lolli text many times a day.

Lolli brought Mary Ellen into contact with her own friends and advisors. Paul Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Petigrow promptly became Mary Ellen's personal counsel as well.

Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Michael

6

Schwager is Lolli's personal accountant and another close friend. Like the Complaint, this decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."[3]

## C. The Takeover

With Dr. Harris's health declining, questions arose as to who would lead the Company. Mary Ellen had no experience or qualifications for the role. The eldest Sibling, Robert M. Harris, Jr., had worked at the Company since 2000, held the office of Vice President, and managed the relationship that generated the Company's royalty stream.

A power struggle ensued with Mary Ellen and the Advisors on the one side and Robert on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his position as an officer. The written consent added Mary Ellen to the board of directors (the "Board"), where Dr. Harris had been the sole director. The plaintiffs assert that Dr. Harris did not

---

[3] The defendants object to this term as an example of improper group pleading, but that objection is not well taken. The term "Advisors" is sufficiently limited to make the allegations plain, and the plaintiffs properly use the term to refer to actions that they believe the Advisors took collectively. They include specific allegations against individual advisors when they intend to call out particular individuals. That is not improper. *See, e.g.*, *In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at *58 n.737 (Del. Ch. May 6, 2021) (finding that complaint "pled specific facts against Garland and Browne" included allegations about "the Special Committee," which was defined to include them); *see also In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) ("Although group pleading is generally disfavored, the Complaint's use of the term 'SoftBank' to capture both SBG and Vision Fund was justified here given the close relationship between these entities plead in the Complaint."); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 796 (Del. Ch. 2009) (rejecting challenge to use of term "D & O Defendants" that was defined to include five individuals), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

7

have the capacity to execute the written consent and that Lolli pulled the strings so that Mary Ellen gained control over the Company.

Immediately after the first consent, Dr. Harris and Mary Ellen executed a second consent that caused the Company to enter into "an agreement with Lolli in substantially the form submitted hereto." Compl. ¶ 32. The consent did not attach an agreement. In June 2015, Lolli and Mary Ellen executed an employment agreement which provided for Lolli's compensation to be determined at an unspecified future date. Petigrow drafted the agreement. The Company began paying Lolli $15,000 annually as an employee and providing her with benefits.

The Company retained Grinnell as a consultant at a rate of $110 per hour. Schwager took over as the Company's accountant. Petigrow began doing more legal work for the Company. The Advisors had gotten their noses inside the tent.

In late summer 2015, Lolli and Grinnell decided to form Royce as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month or $2,496,000 per year. The Company and Royce subsequently entered into a management services agreement that paid Royce $208,334 per month, provided for an annual fee escalator of 3.5%, and renewed automatically every year (the "Royce MSA"). In addition to the monthly fee, Mary Ellen has approved large end-of-year bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

Royce is a shell. It has no employees other than Lolli and Grinnell, and it has no other clients. It has no assets other than its contract with the Company. It operates out of

8

the Company's offices. It exists solely to channel money to Lolli and Grinnell. It has no expenses other than their salaries, pension contributions, distributions, and two $1,000 per month luxury car leases.

**D.     Dr. Harris's GRAT**

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the GRATs. If the GRATs distributed their 490 shares as planned, then control over the Company would pass to the Siblings.

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his GRAT and executed a codicil to his will. Petigrow oversaw the drafting of the documents. The principal consequence of the amendments was to redirect the 245 shares in Dr. Harris's GRAT from the Siblings to Dr. Harris's marital trust. That trust benefits Mary Ellen, and she has a power of appointment over its corpus, enabling her to determine where the assets go when the GRAT terminates. The transaction reduced the number of Shares that the Siblings would receive from 680 to 435, below majority control.

The Advisors wanted a cooperative trustee to oversee Dr. Harris's GRAT and the marital trust, so Lolli and Grinnell turned to Dan Selcow, a wealth manager at First Republic Bank. Lolli and Grinnell had an existing relationship with Selcow, and he was also a friend of Petigrow and Schwager. Initially, they brought some of the Harris' personal accounts to Selcow to manage. Eager for more business, Selcow arranged for First Republic Trust Company of Delaware LLC ("First Republic Delaware") to take over as trustee.

9

Mary Ellen and the Advisors also took control of the family's charity, the Golden Dome Foundation. Mary Ellen removed the Siblings from the board of the foundation and installed Petigrow, Grinnell, and Schwager. Mary Ellen viewed the Foundation as a place to stash money for her future use, explaining that she could "put money in golden dome and i [sic] pay no taxes and if I ever need it I can take a salary." *Id.* ¶ 51.

## E.    The Idea For The Inbound Merger

It was readily apparent that Robert might bring litigation over his removal and the events at the Company. New Jersey recognizes a claim for minority stockholder oppression, and available remedies include orders dissolving the corporation or appointing a custodian or provisional directors. A stockholder oppression lawsuit thus threatened to deprive Mary Ellen and the Advisors of control.

Mary Ellen and the Advisors believed that Delaware law would be more protective of their activities, so they started working on a merger that would move the Company to Delaware (the "Inbound Merger"). As Mary Ellen colorfully put it, "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there." Ex. 1.

In November 2015, Petigrow drafted Dr. Harris's letter of resignation from the Board, which he purportedly signed on November 16, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted two proxies that Mary

10

Ellen could use to vote Dr. Harris's shares, one for Dr. Harris to sign and one for Mary Ellen to sign using her power of attorney.

In December 2015, Mary Ellen provided an initial set of approvals for the Inbound Merger. She also appointed herself President and began paying herself $5 million per year for serving in that role. She continued the payments until 2019, when she resigned after the filing of this litigation. She appointed a lawyer to succeed her and paid him 11.5% of what she paid herself.

On December 7, 2015, Petigrow and Mary Ellen formed a Delaware corporation for use in the Inbound Merger. Two weeks later, Robert had his attorney send a letter to the Company that formally threatened litigation.

That same month, Petigrow wrote to the Siblings to explain why the Company was moving to Delaware. He claimed that the move would generate tax benefits and that the Inbound Merger "will have no effect on a shareholder who lives in New Jersey." Compl. ¶ 75. After that, Grinnell decided that the Company would not provide any more information to stockholders, using Robert's threat of a lawsuit as a pretext.

## F. Value Extraction On A Larger Scale

In 2016, Mary Ellen and the Advisors stepped up their extraction of value from the Company. That year also saw Robert follow through with his threat of litigation by filing an action in New Jersey state court.

In February 2016, Mary Ellen signed a written consent approving an employment agreement with Petigrow. It paid him $600,000 per year to serve as Vice President and General Counsel for the Company. Petigrow continued to run a solo law practice out of the

11

Company's offices, using the Company's personnel and resources, and without paying rent. Given his full-time law practice, Petigrow worked only part-time and sporadically as General Counsel.

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. Petigrow drafted the physician's certificate, which read: "I have concluded, that by reason of progressive mental deterioration, he has, as of the date hereof, become incapacitated to act rationally and prudently in financial matters." Ex. 4. The doctor who signed it has a longstanding relationship with Lolli and works at Bayshore Health Center, which later received a $10 million donation that was paid for by the Company and which supported the creation of an emergency care center in Dr. Harris's name. Ex. 6.[4] Grinnell witnessed the certificate. Ex. 4.

That same month, Mary Ellen adopted a resolution in her capacity as sole director that paid Dr. Harris a bonus in the amount of $15 million. Given Dr. Harris's incapacitation, the $15 million bonus was a disguised distribution to Mary Ellen.

Schwager cashed in too. Given the Company's minimal operations, the services for its accounting and taxes should have cost $20,000 to $30,000 per year. The Company entered into an arrangement with Schwager under which the Company paid him simultaneously on two parallel schedules: (i) $12,500 a month for a total of $150,000 per year, and (ii) $25,000 quarterly for another $100,000 per year. He also received annual

---

[4] As discussed below, the Golden Dome Foundation made the pledge, but Mary Ellen and the Advisors caused the Company to pay it.

"Merry Christmas" bonuses of $35,000. Schwager thus raked in $285,000 per year, ten times what the Company should have been paying. Plus, at the Company's expense, Schwager provided tax and accounting services to Mary Ellen, the Advisors, and their entities, including for Royce. Recognizing the depth of his involvement with the Company, Grinnell referred to Schwager as the Company's Chief Financial Officer.

On May 1, 2016, the Inbound Merger became effective, and the Company emerged as a Delaware corporation. Robert exercised dissenters' rights and pursued an appraisal proceeding in New Jersey state court.

Now firmly in control of the Company, and believing that they had protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of personal expenses. Lolli, Petigrow, and Grinnell reviewed and approved the bills. Schwager paid them. The payments covered:

- a NetJets membership;

- two luxury SUVs;

- hundreds of thousands of dollars in spending at Tiffany & Co.;

- a New York Giants suite;

- personal legal fees;

- personal accounting fees;

- personal meals;

- charges for EZ Pass tolls, gas, car washes, and limousines;

- employees and contractors who worked at a farm owned by Mary Ellen (through an entity); and

- numerous charges for the farm, including for garage doors, gas, disposal, portable toilets, farm equipment and supplies, fiber optic cable, veterinary bills, ATVs, a Vespa, trailers, flooring, capital improvements, and kitchen appliances.

On the Company's taxes, Schwager deducted the expenses as if they were business related.

In April 2017, Dr. Harris died. The shares in his GRAT that would have gone to the Siblings passed to the marital trust.

## G. The Amended Royce MSA

In July 2018, the Company and Royce amended the Royce MSA. The amendment extended the term of the Royce MSA from a one-year agreement that renewed annually to a four-and-a-half-year agreement that ran through December 31, 2022. It also expanded the grounds under which Royce could terminate the agreement for good reason and receive a termination payment. The original version gave Royce the right to terminate for good reason if Mary Ellen ceased being the sole director of the Company. The amended version included a merger, a diminution in Lolli's or Grinnell's responsibilities, or a hostile work environment.

The Royce MSA required that Royce provide the employees necessary to support a corporate office by obligating Royce "at its sole costs and expense, [to] provide executive and administrative assistance to the current President of the Corporation," including the services of Lolli "as an executive/administrative assistant." Compl. ¶ 92. Yet the Company continued paying Lolli a salary and health insurance. The Company also paid for other office employees that Royce was supposed to supply.

Schwager made the payments to Royce from the Company's accounts. Schwager also prepared the Company's financial statements, which obscured the payments that

14

Royce received. Royce did not fulfill the minimal obligation it had under the Royce MSA to contribute $10,000 annually to the preparation of the Company's annual financial statements. Instead, the Company paid Schwager for Royce's expenses.

## H.     The Transactions To Preserve Control

During the second half of 2018, Mary Ellen and the Advisors engaged in two transactions designed to preserve their control over the Company. The first was a settlement with Robert, who was continuing to pursue his lawsuits. Mary Ellen and the Advisors understood that if Robert prevailed in his stockholder oppression action, then they could lose control. Just before Mary Ellen's deposition, she settled with Robert by having the Company pay him more than $20 million.

The second transaction was the Share Withdrawal. Mary Ellen's GRAT was still scheduled to expire on December 31, 2018, at which point 245 shares representing just under 25% of the Company's common stock would be distributed to the Siblings. Under the trust agreement governing the GRAT, Mary Ellen could withdraw assets if she provided the trust with "equivalent value." Compl. ¶ 95. The Advisors decided that Mary Ellen would withdraw the shares at a lowball price, thereby benefiting herself by preventing a block of shares from falling into potentially adverse hands while expropriating the difference between the lowball price and fair value.

To support a lowball price for the Share Withdrawal, Petigrow commissioned an appraisal of the Company from EisnerAmper LLP, a valuation firm. Schwager helped furnish the firm with information. EisnerAmper had performed valuation work for Mary Ellen on two prior occasions, including as an expert in Robert's lawsuit. Mary Ellen had

15

one of the New Jersey lawyers currently serving as forwarding counsel for the Company ("Company Forwarding Counsel") sign the engagement letter, which specified that EisnerAmper was working for the lawyer. Yet the Company paid EisnerAmper's fee. The Company also paid Petigrow, Schwager, Grinnell, Lolli, and Company Forwarding Counsel for their work on the Share Withdrawal.

The appraisal valued the Company at $242,863,296. The plaintiffs have pointed to substantial flaws in the appraisal, including a facially questionable 20% company-specific risk premium that increased the discount rate from 13% to 33%. The 20% company-specific risk premium was based in large part on a pending application by generic pharmaceutical companies for certiorari to the Supreme Court of the United States. As of November 19, 2018, weeks before what should have been a December valuation date, the Supreme Court had denied certiorari. *See Accord Healthcare, Inc. v. UCB, Inc.*, 139 S. Ct. 574 (2018). After more questionable discounts, the report appraised the 245 shares at $52,677,000, or 21.7% of the value of the Company. The shares represented 24.5% of the Company's capitalization, so on that basis alone, Mary Ellen was paying 88.5% of their value (21.7% divided by 24.5%) for a built in 11.5% discount. The underpricing was much greater because the Company itself was undervalued. Backing out the 20% company-specific risk premium increases the value of the Company to $325 million. A 24.5% share of that value is $79,625,000. Mary Ellen's valuation was 66.1% of that figure, meaning that Mary Ellen was getting a 33.9% discount.

With a lowball valuation in hand, the next step was to find a trustee who would go along with the Share Withdrawal. And with the expiration date of the GRAT rapidly

16

approaching, Mary Ellen and the Advisors needed a trustee who would sign off quickly, before December 31, 2018.

The Advisors went back to First Republic Bank, where Selcow had benefitted from managing more and more of Mary Ellen's assets. Selcow secured the greenlight internally to have First Republic Delaware become the trustee. Selcow had a conflict of interest for purposes of the Share Withdrawal because his compensation depended on increasing assets under management for First Republic Bank and generating referral fees. The Advisors indicated that after the Share Withdrawal, Mary Ellen would divide the GRAT into five successor trusts, one for each Sibling, with Selcow managing the funds. By signing off on the Share Withdrawal, Selcow, First Republic Bank, and First Republic Delaware gained a new pool of $50 million to put in fee-generating assets. First Republic Delaware also had a conflict, because First Republic Bank loaned Mary Ellen the money for the Share Withdrawal. First Republic Bank thus had a buy-side interest in the same transaction where First Republic Delaware was supposedly evaluating the deal as a fiduciary for the seller.

Grinnell and Lolli pushed Petigrow to complete the Share Withdrawal quickly. Schwager worked on the financial side. Petigrow coordinated the legal documentation.

First Republic Delaware officially became trustee of Mary Ellen's GRAT on December 24, 2018. Within two days after being appointed a trustee, First Republic Delaware had approved the Share Withdrawal at the valuation set by Mary Ellen's appraiser. First Republic Delaware did not negotiate. First Republic Delaware claimed that it "conducted such due diligence as it determined advisable and has determined that the

17

properties acquired and substituted by the Grantor are of equivalent value, and consents to the substitution of assets." Ex. 12 at 1.

In the same document in which it signed off on the Share Withdrawal, First Republic Delaware secured indemnification from Mary Ellen for any liability resulting from the Share Withdrawal. *Id.* at 2. Mary Ellen committed to "defend First Republic with the counsel of [Mary Ellen's] choice," First Republic Delaware agreed not to enter into a settlement without Mary Ellen's consent, and the two parties agreed to cooperate in any litigation. *Id.* When First Republic Delaware made and received those commitments, it was nominally adverse to Mary Ellen on the Share Withdrawal and obligated as trustee to sue Mary Ellen to protect the GRAT if the trust did not obtain equivalent value for the shares.

With the Share Withdrawal complete, Grinnell thanked the First Republic team for a "great job." Compl. ¶ 108. Grinnell wrote to Lolli: "CONGRATULATIONS!!!" *Id.*

Also in December 2018, the Golden Dome Foundation made two $5 million irrevocable pledges to Bayshore Medical Center, where the doctor worked who had declared Dr. Harris incompetent. One $5 million pledge had a seven-year term that contemplated equal payments of approximately $715,000. The Company began paying the roughly $715,000 installments. The second $5 million pledge had no installment payments. After this litigation was filed, the Company paid the second pledge.

## I.     Tim Harris Hires Counsel And Asks Questions.

The Siblings had heard rumblings about the Share Withdrawal. On February 14, 2019, Loewenberg wrote to the Advisors: "I spoke with my mother on Friday about the GRAT, and she said she has no idea what is going on with it and to call [Company

18

Forwarding Counsel]. I spoke with [Company Forwarding Counsel], and she said she isn't involved with the GRAT." *Id.* ¶ 109. That representation was false. Company Forwarding Counsel had signed EisnerAmper's engagement letter. Over a month later, First Republic Delaware told Tim Harris that "Mary Ellen exercised her power to substitute the Harris FRC stock with cash." *Id.* ¶ 110. That same week, First Republic Bank was in discussion with the Advisors about moving the "Mary Ellen and the Harris FRC relationship from Schwab to First Republic." *Id.* ¶ 111.

On April 10, 2019, Tim Harris's counsel in this action attended the annual meeting as his proxy. Petigrow and Grinnell attended for the Company. Mary Ellen did not attend. Petigrow chaired the meeting. Grinnell refused to identify himself. Petigrow called for a vote for the election of Mary Ellen as the Company's sole director and exercised proxies from Mary Ellen and First Republic Delaware in favor of her election. The proxies represented a majority of the Company's voting power. After tallying the vote, he called the meeting to a close.

Before the meeting was adjourned, Tim Harris's counsel asked for a report on the business of the Company, then followed up with a series of specific questions. Petigrow and Grinnell failed to provide substantive answers on numerous topics. Grinnell repeatedly asserted that all stockholder questions needed to be put in writing.

## J.     The Outbound Merger

With Tim Harris having retained a Delaware lawyer whose questions had not been answered, the Advisors anticipated that a books-and-records demand would be coming. Immediately after the annual meeting, Mary Ellen and the Advisors started working on a

19

plan for a merger that would take the Company out of Delaware and back into New Jersey (the "Outbound Merger"). Grinnell circulated a New Jersey Supreme Court decision which indicated that inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders. The Company did not keep minutes, and Schwager prepared the Company's financial statements so that they did not reveal the many self-interested transactions or the payments to Royce. The Advisors thought the Outbound Merger could be used to prevent Tim Harris from obtaining information about what was going on at the Company. They also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger, as they have argued in this case. It therefore seemed that they could move the Company back to New Jersey without walking into the type of lawsuit for stockholder oppression that they originally moved to Delaware to evade. And if someone eventually threatened such a lawsuit, they could always move the Company again.

On May 6, 2019, Tim Harris sent the Company a written demand for documents under Section 220. On May 13, the Company refused to produce any documents, claiming the demand constituted "harassment." *Id.* ¶ 127.

The Outbound Merger became effective on May 17, 2019. Mary Ellen approved the Outbound Merger as a director, and Mary Ellen and First Republic Delaware executed written consents approving it as stockholders.

The notice provided scant information about the Outbound Merger. It offered only the following justification:

The Delaware Reincorporation was effected with the intent of capturing certain efficiencies that were deemed at the time to be in the best interest of the predecessor company and its stockholders. The board of directors of Harris Delaware has determined that the circumstances giving rise to such potential efficiencies are no longer present. . . . Harris Delaware's board of directors has determined that it is advisable for Harris Delaware's internal affairs to be governed by New Jersey law.

*Id.* ¶ 131. The notice did not include any information about the large payments going to Royce and to Schwager, the plentitude of personal expenses being paid for by the Company, or the numerous entities being run out of the Company's offices.

After the Outbound Merger, Mary Ellen and the Advisors caused the Company to break with a decade-long practice of making quarterly distributions, even though the Company is an S Corporation, and so the stockholders have to pay taxes on imputed income. Mary Ellen has admitted that the change was made so that the Siblings could not use the distributions to pay their attorneys. The change did not affect Mary Ellen, who had the Company pay for her counsel and was paying herself $5 million per year.

## K.    This Litigation

The Outbound Merger stymied Tim Harris's attempt to use Section 220, but it opened up another informational avenue. Tim Harris sought appraisal for one share of Company common stock. In discovery, he requested the information that a books-and-records inspection would have generated. Discovery did not go smoothly, and the court has expended significant judicial resources addressing various discovery motions.

Within weeks after Tim Harris petitioned for appraisal, Grinnell and Petigrow prepared revised versions of the Royce MSA and Petigrow's employment agreement. In the amendment to the Royce MSA dated September 27, 2019, they expanded the triggers

for Royce to terminate the agreement for good reason and receive liquidated damages to include a sale of assets. The amendment confirmed that after a termination for good reason, the liquidated damages amount equaled the full value of the contract through December 31, 2022. On the same day, Petigrow entered into an amended employment agreement that extended the term of the contract through December 31, 2022, allowed Petigrow to terminate the agreement for good reason, and provided for a change-of-control payment triggered by a sale of assets. Within a week after executing these documents, the Company began a process to sell its assets.

When Tim Harris began pursuing discovery in the appraisal proceeding, the Company, Mary Ellen, Lolli, and Grinnell responded with a campaign of obstruction that is redolent of bad faith. In response to Tim Harris's initial discovery requests, the Company refused to provide information about Royce, about expenditures and compensation, or about the relationships between Mary Ellen and the Advisors. In its interrogatory responses, the Company stated that Lolli was an employee of the Company, but concealed her role with Royce. The Company identified Grinnell as an independent contractor, but concealed his role with Royce. The responses did not identify salaries or bonuses of any employees or contractors. The responses did not disclose the Company's payments of personal expenses.

The Company then seized on the pandemic to claim that it could not engage in discovery because it could not access any of its documents. In reality, the Advisors were accessing the Company's offices and setting up data rooms for potential buyers of the Company's assets. By April 2020, the Company had completed a due diligence process

22

and entered into a term sheet to sell its assets, while continuing to represent to Tim Harris and to the court that it could not access any documents for purposes of discovery.

Tim Harris filed a motion to compel, and on June 2, 2020, the court ordered the Company to produce documents and answer interrogatories. On June 8, the Company supplemented its interrogatories. The Company disclosed for the first time that Royce existed, that Grinnell was an owner of Royce, and that Royce was paid $215,000 a month. The responses again concealed Lolli's role with Royce, claiming she was a Company employee whose annual salary was $15,600. That answer was plainly misleading. The responses did not disclose any bonuses or other benefits received by Petigrow or any other employees. The interrogatory responses did not disclose the Company's payment of personal expenses.

Shortly thereafter, the Company's first set of Delaware counsel withdrew from the case.

On July 14, 2020, a discovery vendor for the Company imaged the phones of Mary Ellen, Petigrow, and Grinnell. Mary Ellen's phone had no text messages with any of the Advisors. She has since admitted that she intentionally deleted all of her text messages with the Advisors because she did not want them produced in discovery.

Petigrow had only one text message with Lolli on his phone, which was from the day before the collection: "I have Chuck [Grinnell] on the phone." Petigrow had four text messages with Company Forwarding Counsel. All of those texts were sent or received within roughly a week of the collection. No other texts remain. Petigrow has since admitted that he regularly deleted messages from his phone.

23

Grinnell had no text messages with any of Mary Ellen, Lolli, Schwager, or Petigrow on his phone.

Company Forwarding Counsel instructed the vendor to destroy the images of Grinnell and Petigrow's phones on the day of the collection.

Lolli would not permit her phone to be imaged. Her personal counsel searched her phone manually and represented that no responsive text messages existed. Lolli's counsel later declined to state whether any text messages still existed on the phone.

Shortly after the phone collection, the Company's second set of Delaware counsel withdrew from the case.

## L.  The Sale Of Assets

In July 2020, the Company agreed to sell its assets for $342 million in cash. That amount was $100 million more than the valuation of $242,863,296 that EisnerAmper placed on the Company for purposes of the Share Withdrawal. The amount is quite close to the figure of $325 million that results from backing out the facially implausible 20% company-specific risk premium that boosted the discount rate to 33%. Internally, First Republic Delaware noted the gulf between the two prices. First Republic Delaware then promptly signed off on the sale, without asking any questions.

## M.  More Discovery Misconduct

On December 4, 2020, the Company served supplemental interrogatory responses which stated that Grinnell and Lolli had refused to disclose their compensation from Royce. On December 7, Lolli resigned from her position as an employee, effective as of December 18. On December 8 and 9, the Company paid a total of $250,000 to Lolli's personal New

Jersey counsel. On December 11, the Company paid $250,000 to another New Jersey firm representing Royce, Grinnell, and Lolli.

On December 16, 2020, Royce's New Jersey counsel wrote a letter to Company Forwarding Counsel demanding $5 million purportedly due to Royce. The plaintiffs contend that no money was due to Royce. On December 31, Mary Ellen caused the Company to pay $4.9 million to Royce.

## N. The New Jersey Actions

Unable to obtain meaningful information about Royce from the Company, Tim Harris's counsel issued subpoenas to Grinnell, Royce, and Bank of America, N.A., where Royce appeared to have its bank account. Grinnell and Royce responded by filing a miscellaneous proceeding in New Jersey state court to quash the subpoenas. During a series of conferences with the New Jersey judge, Grinnell and Royce first refused to produce anything, then agreed to produce W-2s and K-1s, then refused to produce K-1s, and then reverted to refusing to produce anything. Their counsel could not explain their about face. She has since withdrawn.

Given the problems that were plaguing the discovery process, the court appointed a discovery facilitator. He recommended that Royce and Bank of America produce documents in response to the subpoenas. Lolli, Grinnell, and Royce lashed out by filing another action in the New Jersey state court, this time alleging purported constitutional violations and seeking to enjoin Bank of America from complying with this court's subpoena. The New Jersey court subsequently denied the application. Lolli, Grinnell, and

Royce filed an amended complaint repackaging their allegations as a claim for malicious prosecution.

On May 21, 2020, this court entered an order enforcing its subpoena and directing Bank of America to produce its records. One month later, the court ordered the Company to disclose whether it was funding the litigation Lolli, Grinnell, and Royce had filed in New Jersey.

Company counsel had averred that the Company was not funding any offensive or personal litigation claims in New Jersey. That representation appears false. The Company had provided Lolli and Royce with the attorney fee payments discussed above. Moreover, on the same day that the court ordered the Company to respond, the Company paid Lolli another $450,000 in a so-called settlement. It is reasonable to infer that the settlement was a fig leaf to conceal the Company's funding of the New Jersey litigation.

The court next ordered Mary Ellen to produce phone and text logs. The logs of her texts with Lolli alone covered 750 pages with approximately forty entries per page. The logs also reflected extensive texting with the other Advisors. Mary Ellen admitted that she intentionally destroyed all of her text messages so they could not be produced in discovery.

Tim Harris sought Lolli's phone and text logs. The Company paid Lolli's counsel to threaten Tim Harris and his counsel, and the Company opposed the follow-on motion to compel. After the court ordered the logs produced, AT&T produced over 1,000 pages of text message logs, with about forty entries per page, between Lolli and Grinnell, Petigrow, Mary Ellen, and Schwager. Lolli has not produced any texts, and her counsel has refused

to answer any inquiries about the existence or destruction of the texts. It is reasonable to infer that she deleted them all.

The plaintiffs sought to take Mary Ellen's deposition. Her counsel claimed she was medically unfit. Counsel never provided a description of her alleged ailment and never provided any medical records or a physician's declaration substantiating her claim.

## O.     The Special Litigation Committee

In September 2021, Tim Harris filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and claims for breach of fiduciary duty and aiding and abetting against the Advisors. In October, Kristen Harris and Megan Harris Loewenberg joined the case as additional plaintiffs.

In October 2021, Mary Ellen and the Advisors recruited Robert Pincus, a respected Delaware lawyer, to join the Board and serve as a one-person special litigation committee (the "SLC"). The plaintiffs stood down to permit the SLC to investigate. The plaintiffs also agreed to mediate with the SLC.

On December 13, 2021, the SLC began looking into whether Company Forwarding Counsel should represent the Company in this litigation while simultaneously representing Mary Ellen personally in litigation in New Jersey. On December 29, while the SLC's counsel was on vacation, the Company filed an answer. The answer included numerous denials of factual allegations; claimed that demand was required, even though the SLC had already been formed; and alleged that Tim Harris brought the Delaware action in bad faith. The decision whether to file an answer plainly fell within the SLC's authority, yet the Company filed the answer without informing the SLC or seeking the SLC's approval. After

27

this incident, the SLC advised Company Forwarding Counsel not to continue representing the Company. To this day, Company Forwarding Counsel continues to represent the Company.

On January 21, 2022, Pincus resigned from the Board, disbanded the SLC, and expressly took no position on the plaintiffs' claims.

## P. The Currently Operative Complaint

In March 2022, the plaintiffs filed the Complaint. It asserts claims against Mary Ellen, Lolli, Grinnell, Royce, Petigrow, and Schwager.

Count I of the Complaint asserts that Mary Ellen breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. The Complaint groups the breaches into six broad categories:

- approving self-interested and unfair compensation and other personal payments to herself;

- using Company resources for personal gain, including by supporting her personal ventures and engaging in transactions to maintain her control;

- colluding with the Advisors by providing them with exorbitant compensation and benefits to pay them off for helping her engage in and cover up wrongdoing at the Company;

- sequestering distributions to oppress stockholders;

- engaging in the Inbound Merger and Outbound Merger; and

- verifying knowingly incomplete and misleading discovery responses.

In the Standing Decision, this court held that the only theory currently at issue in Count I is a direct challenge to the Outbound Merger. 2023 WL 115541, *2. The derivative claims that were originally the subject of Count I remain at issue, but as corporate assets to be

28

valued in connection with the challenge to the Outbound Merger, rather than as independent claims that could support relief in their own right.

Skipping for the moment over Count II, Count III asserts claims for breach of fiduciary duty against the Advisors in their capacity as officers and agents. The Complaint alleges that Petigrow is a *de jure* officer, having agreed to serve as General Counsel. The Complaint alleges that Grinnell, Lolli, and Schwager acted as *de facto* officers. The Complaint alleges in the alternative that all were senior managers and agents of the Company who owed fiduciary duties in those capacities. The substance of the claims for breach of fiduciary duty against the Advisors generally tracks the claims against Mary Ellen, including:

- working with Mary Ellen to enable her to extract excessive compensation and benefits for herself;

- extracting excessive compensation and benefits for themselves as a *quid pro quo* for helping Mary Ellen;

- using Company resources for personal gain, including for non-Company related businesses such as Petigrow's law firm, the Golden Dome Foundation, and various businesses associated with Lolli and Grinnell;

- using Company resources to help Mary Ellen maintain her control over the Company;

- assisting Mary Ellen in sequestering distributions to oppress stockholders;

- engaging in the Inbound Merger and Outbound Merger as part of the effort to cover up wrongdoing at the Company; and

- verifying knowingly incomplete and misleading discovery responses.

The Standing Decision applies to this count, so the only theory currently at issue is a direct challenge to the Outbound Merger.

29

Count IV alleges in the alternative that to the extent the Advisors are not accountable for breaching their own duties as fiduciaries of the Company, both they and Royce have aided and abetted the breaches of fiduciary duty by Mary Ellen, Petigrow, and any other Advisor that is found to have owed fiduciary duties. The Standing Decision applies to this count as well, so the only theory currently at issue is a direct challenge to the Outbound Merger.

The other two counts address the Share Withdrawal. Count II of the Complaint asserts that Mary Ellen breached the trust instrument governing her GRAT by failing to pay reasonably equivalent value in the Share Withdrawal. Count V asserts that Lolli, Grinnell, Petigrow, Schwager, and Royce tortiously interfered with the trust instrument by assisting Mary Ellen with the Share Withdrawal.

Count VI is the claim for an appraisal.

The defendants moved for dismissal on a multitude of grounds. This decision addresses Lolli and Grinnell's motion to dismiss Counts III, IV, and V on the theory that the court cannot exercise personal jurisdiction over them, as well as Royce's motion to dismiss Counts IV and V on the same basis. It also addresses the argument raised by Lolli, Grinnell, and Royce that this court is an improper venue because any claims relating to the Royce MSA are governed by a forum selection clause in that agreement.

## II.    THE RULE 12(B)(2) MOTION

Lolli and Grinnell maintain that that this court cannot exercise personal jurisdiction over them for purposes of Count III, IV, or V, and Royce maintains that that this court cannot exercise personal jurisdiction over it for purposes of Count IV or V.. "Generally, a

30

plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant." *Benerofe v. Cha*, 1996 WL 535405, at \*3 (Del. Ch. Sept. 12, 1996). However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

The plaintiffs' burden in responding to a Rule 12(b)(2) motion is an evidentiary burden, not a pleading burden. *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991) (Allen, C.). A verified complaint satisfies the requirements for an affidavit and provides an evidentiary basis on which the plaintiff can rely. *See Bruce E. M. v. Dorothea A. M.*, 455 A.2d 866, 869 (Del. 1983) ("A verified pleading may also be used as an affidavit if the facts stated therein are true to the party's own knowledge."); *accord Weber v. Kirchner*, 2003 WL 23190392, at \*3 (Del. Ch. Dec. 31, 2003); *Taylor v. Jones*, 2002 WL 31926612, at \*2 n.6 (Del. Ch. Dec. 17, 2002).

When considering a Rule 12(b)(2) motion, the court is not limited to the allegations of the complaint and can consider evidentiary submissions provided by the parties.[5] If the

---

[5] *Sample v. Morgan (Sample II)*, 935 A.2d 1046, 1055–56 (Del. Ch. 2007) ("In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am 'permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction.'" (quoting *Crescent/Mach I*, 846 A.2d at 974; *Ryan*, 935 A.2d at 265 ("In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record.").

31

court has not conducted an evidentiary hearing, then a plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[6] If the court takes that approach, then the jurisdictional question technically remains open until trial, when the plaintiff must prove the jurisdictional facts by a preponderance of the evidence.[7]

The facts necessary to demonstrate the existence of personal jurisdiction are often in the exclusive control of the defendant. *See Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255–56 (1st Cir. 1966). "As a plaintiff does have an evidentiary burden, [it] may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be precluded from reasonable discovery in aid of mounting such proof." *Hart*, 593 A.2d at 539. "Only where the facts

---

[6] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at \*5 (Del. Ch. July 14, 2008); *Sample II*, 935 A.2d at 1056 ("In evaluating the record [on a Rule 12(b)(2) motion], I must draw reasonable inferences in favor of the plaintiff."); *Ryan*, 935 A.2d at 265 ("If . . . no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." (footnotes and quotation marks omitted)).

[7] *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial.'" (quoting *Data Disc, Inc. v. Sys. Tech. Assocs. Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977) and *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))).

alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction." *Id.* As long as the plaintiff has provided "some indication" that the particular defendant is amenable to suit, then jurisdictional discovery is appropriate. *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1977) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.").

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a valid method of serving process. Second, the exercise of personal jurisdiction must rest on sufficient minimum contacts between the defendant and Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The plaintiffs seek to serve Lolli and Grinnell under Delaware's Long-Arm Statute.[8] It provides:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an

---

[8] Because a valid method of service exists under Delaware's Long-Arm Statute, this decision does not address the plaintiffs' arguments that Lolli and Grinnell can be served as *de facto* officers under Delaware's Officer Consent Statute, 10 *Del. C.* § 3114(b).

33

agent: (1) Transacts any business or performs any character of work or service in the State . . . .

10 *Del. C.* § 3104(c)(1). A person who has engaged in such an act has established "a legal presence within the State" and "thereby submits to the jurisdiction of the Delaware courts." *Id.* § 3104(b).

Section 3104 is a "single act" statute. *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980). Therefore, a "single transaction is sufficient to [authorize service and] confer jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (cleaned up). The defendant need not engage in the act themselves; the Long-Arm Statute recognizes that the forum-directed activity can be accomplished "through an agent." 10 *Del. C.* § 3104(c). When defendants conspire to engage in tortious activity, then the Delaware-directed act of any one of the co-conspirators can be attributed to the others for purposes of jurisdiction under the Long-Arm Statute. *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982) ("[I]f the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court.").

Section 3104(c) is to be "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *accord LaNuova D & B, S.p.A v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

> [T]rial courts must give a broad reading to the terms of the long-arm statute[] in order to effectuate the statute's intent to ensure that this state's court may

> exercise jurisdiction to the full limits permissible under the Due Process Clause. In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly.

*Sample II*, 935 A.2d at 1056 (footnotes omitted). That said, there must be a sufficient nexus between the jurisdictional act and the claims that the party is asserting. *LaNuova*, 513 A.2d at 768 (explaining that the transaction of business only supports jurisdiction "with respect to claims which have a nexus to the designated conduct").

The constitutional dimension of the personal jurisdiction analysis examines whether it would be fair to compel a defendant to litigate in the forum state. "The well-established point of departure is that certain minimum contacts must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him." *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981) (internal quotation marks omitted), *aff'd*, 681 F.2d 807 (3d Cir. 1982). The question is whether the defendants had sufficient minimum contacts with Delaware such that "compelling [them] to defend [themselves] in the State would be consistent with the traditional notions of fair play and substantial justice[.]" *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

## A.    Personal Jurisdiction For Purposes Of Count V

Count V asserts that Lolli and Grinnell tortiously interfered with the instrument governing Mary Ellen's GRAT by assisting her with the Share Withdrawal. Count V offers a straightforward place to begin because this court addressed several of the key issues when denying a motion that Petigrow made to dismiss Count V on the grounds that this court

35

could not exercise personal jurisdiction over him. *Harris v. Harris*, --- A.3d ----, 2023 WL 165967 (Del. Ch. Jan. 12, 2023) (the "Petigrow Decision"). Although the analysis is slightly different for Lolli and Grinnell, the court can exercise personal jurisdiction over them as well.

### 1. A Delaware-Directed Act Attributable To Lolli And Grinnell For Purposes Of Count V

The first step in assessing whether personal jurisdiction exists is to identify a statutory basis for service of process. Proper service under Delaware's Long-Arm Statute requires a Delaware-directed act. In the Petigrow Decision, this court held that the act of moving the situs of Mary Ellen's GRAT to Delaware by appointing First Republic Delaware as the GRAT's trustee (the "GRAT Domestication") was a Delaware-directed act that was sufficient to support service of process under the Long-Arm Statute. This court also held that the domestication of the GRAT was sufficiently connected to the Share Withdrawal to support the exercise of personal jurisdiction for claims related to the Share Withdrawal. 2023 WL 165967, at *20–21. The same reasoning and rulings apply to Lolli and Grinnell's motion.

The remaining question is whether Lolli and Grinnell were sufficiently involved in the GRAT Domestication such that the Delaware-directed act can be attributed to them. The conspiracy theory of jurisdiction fills the gap by recognizing that when defendants have acted together to engage in tortious activity, the act can be attributed to all of the co-conspirators. Under the conspiracy theory of jurisdiction,

> a conspirator who is absent from the forum state is subject to the jurisdiction
> of the court, assuming he is properly served under state law, if the plaintiff

36

can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario*, 449 A.2d at 225.

The first three *Istituto Bancario* elements speak to the requirements of Delaware's Long-Arm Statute. The third *Istituto Bancario* element—whether a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"—corresponds to the statutory requirement that the defendant have transacted business or performed work in the State. The first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes." *Hercules*, 611 A.2d at 481; *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.). It remains true that the conspiracy theory itself is not an independent basis for jurisdiction that alleviates the need to establish a statutory hook to support service under Section 3104. *Hercules*, 611 A.2d at 482 n.6. But the first, second, and third *Istituto Bancario* elements correspond sufficiently with the requirements of Section 3104 such that satisfying the former accomplishes the latter.

The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the defendant was a member of the conspiracy. 449 A.2d at 225. Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not

37

limited to that particular tort.[9] Count V pleads a different species of tort claim: tortious interference with contract.

A complaint will support an inference of a conspiracy when it pleads facts supporting (i) the existence of a confederation or combination of two or more persons; (ii) that an unlawful act was done in furtherance of the conspiracy; and (iii) that the conspirators caused actual damage to the plaintiff. *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006). The Complaint does not explicitly contain a claim for conspiracy, but that is not an impediment for purposes of analyzing personal jurisdiction, because a plaintiff does not have to plead the existence of personal jurisdiction in its complaint. *See Benerofe*, 1996 WL 535405, at *3.

The Complaint alleges that the four Advisors acted in combination to tortiously interfere with the trust instrument governing Mary Ellen's GRAT, thereby causing actual damage to the plaintiffs. The Complaint pleads specifically that the Advisors acted in

---

[9] *See id.* at 222–25 (describing underlying theory without fraud-based limitation); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635–36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016); *In re Tilray, Inc. Reorganization Litig.*, 2021 WL 2199123, at *19 (Del. Ch. June 1, 2021) (noting that "[t]his court has recognized that a breach of fiduciary duty . . . and that control group theories[]like aiding and abetting claims" can supply a proper tort for the conspiracy theory of jurisdiction); *Perry v. Neupert*, 2019 WL 719000, at *24 (Del. Ch. Feb. 15, 2019) (noting that theory encompasses claims of conversion); *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Crescent/Mach I*, 846 A.2d at 977 (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

38

concert to engage in the GRAT Domestication. According to the Complaint, "[o]n December 24, 2018, the Advisors caused the removal of Premier Trust as the Mary Ellen GRAT trustee and installed First Republic." Compl. ¶ 105. Lolli and Grinnell are two of the Advisors.

The Complaint specifically pleads facts which support an inference that Grinnell was an active member of the conspiracy. He reported to Lolli about the lowball EisnerAmper report. *Id.* ¶ 99. He worked with First Republic Delaware to hire a second appraiser firm for the nominal fee of $5,000 to sign off on the EisnerAmper valuation. *Id.* ¶ 98. He arranged for Mary Ellen to pay the second appraiser. *Id.* He helped secure the loan from First Republic Bank that Mary Ellen used to fund the Share Withdrawal. *See id.* ¶ 103. Together with Lolli, he pushed Petigrow to complete the Share Withdrawal quickly before the December 31, 2018 deadline. *Id.* ¶ 104.

Grinnell had close ties with Selcow and First Republic Bank that were likely instrumental in convincing First Republic Delaware to become the trustee of the GRAT and permit the Share Withdrawal to go forward on an expedited basis. For example, Selcow told his colleagues that Grinnell was a client of his who had followed him to First Republic Bank. *Id.* ¶ 222. In 2017, Grinnell met with the President of First Republic Bank in New York to discuss its relationship with Mary Ellen during an event First Republic Bank hosted for the Macy's Day Parade. *Id.* ¶ 226. Selcow told Grinnell that "Mary Ellen's relationship with me and First Republic would not be possible without you, Judy [Lolli], Mike [Schwager] and Paul [Petigrow]." *Id.* ¶ 227. Selcow told his colleagues that he was "very close to Judy [Lolli], [her husband] Victor, Chuck [Grinnell] and Mike Schwager." *Id.*

39

Given these allegations, it is reasonable to infer that Grinnell was part of the conspiracy to engage in the GRAT Domestication as a predicate act supporting the claim for tortious interference that the plaintiffs have asserted against the Advisors. The Complaint therefore pleads facts sufficient to support service of process on Grinnell for purposes of Count V.

The Complaint pleads fewer facts regarding Lolli's involvement with the GRAT Domestication, but the allegations remain sufficient to support an inference that Lolli was a participant in the conspiracy. The Complaint pleads that Lolli discussed the EisnerAmper valuation with Grinnell and that Lolli joined Grinnell in pushing Petigrow to complete the Share Withdrawal. *Id.* ¶¶ 99, 104. In addition, like Grinnell, Lolli had connections with Selcow that were likely instrumental in convincing First Republic Delaware to become the trustee of the GRAT and permit the Share Withdrawal to go forward on an expedited basis. Selcow told his colleagues that Lolli, like Grinnell, was a client who had followed him to First Republic Bank. *Id.* ¶ 222. By May 2016, Selcow was working with Lolli on planning for the Harris' *inter vivos* trusts, the GRATs, the bonus payment for Dr. Harris, and the Golden Dome Foundation, and the CEO of First Republic Bank was scheduled to meet with Mary Ellen and Lolli. *Id.* ¶ 225. Selcow's favorable comments about the basis for his relationship with Mary Ellen specifically credited Lolli.

As with Grinnell, it is reasonably conceivable that Lolli played a significant role in the GRAT Domestication and Share Withdrawal. *Id.* ¶ 227. Providing support for this inference, the Complaint contains extensive allegations about Lolli's role as Mary Ellen's Svengali and the significant benefits Lolli has achieved in return, including:

40

- Lolli and Mary Ellen are next door neighbors in Holmdel, New Jersey, and have side-by-side beach houses in Point Pleasant, New Jersey. *Id.* ¶ 218.

- Lolli co-owns a business with Mary Ellen. *Id.* ¶ 29.

- Lolli secured a consent from Dr. Harris that appointed Mary Ellen as a member of the Board and removed Robert from his position as an officer of the Company. *Id.* ¶ 31.

- Lolli received an employment agreement with the Company that provided for compensation to be determined by Lolli and Mary Ellen at some future date. *Id.* ¶ 34.

- Lolli witnessed the 2015 codicil and amendment to Dr. Harris's GRAT that enabled Mary Ellen to preserve majority control over the Company. *Id.* ¶¶ 61, 63, 67.

- Lolli helped secure proxies for Mary Ellen to vote Dr. Harris's shares and witnessed a power of attorney that Dr. Harris executed in favor of Mary Ellen. *Id.* ¶ 70.

- Lolli holds a 60% interest in Royce, which received $20 million from the Company between 2015 and 2020. *Id.* ¶¶ 6, 22.

- The Royce MSA designates Lolli as a "key employee." *Id.* ¶ 37.

- The Company and Royce twice amended the Royce MSA to confer additional benefits on Royce, Lolli, and Grinnell. *Id.* ¶¶ 89–91,

- The Company funded a $500,000 retainer in December 2020 for Lolli and Grinnell. *Id.* ¶¶ 44, 163–164.

- The Company paid $4.9 million to Royce in December 2020. *Id.* ¶ 169.

- Lolli received $450,000 as a "settlement" on the same day that the court ordered the Company to disclose whether it was paying Lolli's legal fees. *Id.* ¶¶ 14, 184.

To reiterate, the allegations regarding Lolli and Grinnell make it reasonable to infer that they were sufficiently involved in the GRAT Domestication to support service of process under the Long-Arm Statute for claims relating to the Share Withdrawal. At a minimum, the court would permit the plaintiffs to seek jurisdictional discovery to examine the connections between Lolli and Grinnell and the GRAT Domestication.

41

In this case, however, there is substantial evidence that Lolli and Grinnell have spoliated evidence, making jurisdictional discovery unwarranted and entitling the plaintiffs to a pleading-stage inference that Lolli and Grinnell were part of a conspiracy to engage in Delaware-directed acts sufficient to support personal jurisdiction over them for purposes of Count V. Federal courts have held that when parties have engaged in spoliation, "an adverse inference may be drawn at the motion to dismiss stage." *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *9 n.92 (Del. Ch. Dec. 10, 2018) (collecting federal authority). When confronted with a request for an inference in connection with a Rule 12(b)(6) motion, Vice Chancellor Slights declined to rule on it, while explaining that "[t]o allow a defendant to spoliate evidence and profit thereby would foster bad policy and violate venerable legal maxims." *SPay, Inc. v. Stack Media Inc.*, 2021 WL 6113336, at *2 (Del. Ch. Dec. 21, 2021) (ORDER). The plaintiff in *SPay* alleged that the defendant had "destroyed emails that, at the time of the spoliation, belonged to Plaintiff and, but for the spoliation, would have been available to Plaintiff when it drafted the Complaint." *Id.* Vice Chancellor Slights held that "an adverse inference could be justified should the facts corroborate Plaintiff's accusations" and "show that Defendant(s) intentionally or recklessly spoliated evidence." *Id.* at *2–3. Rather than drawing the inference based on the complaint's allegations, he directed the parties to take discovery on the spoliation issue so that the court could hold an evidentiary hearing on spoliation before resuming its consideration of the motion to dismiss. *Id.*

In the current case, the plaintiffs already have provided persuasive evidence that Lolli and Grinnell engaged in spoliation:

42

- The Company refused to produce documents relating to Royce and provided misleading and incomplete interrogatory responses about Royce, Lolli, and Grinnell. The Company's supplemental interrogatory responses contained more misleading responses.

- Mary Ellen produced no texts, and counsel represented to plaintiffs that Lolli and Mary Ellen did not communicate via text.

- When Mary Ellen's phone was imaged, it contained no texts with Lolli, Grinnell, Petigrow, or Schwager. Mary Ellen admitted that she deleted them to keep the Siblings from discovering them.

- When Grinnell's phone was imaged, it contained no texts with Lolli, Petigrow, Schwager, or Mary Ellen. Grinnell admitted that he deleted his texts.

- Lolli refused to have her phone imaged. She and her counsel refused to answer basic questions about the existence of her text messages, permitting an inference that if they provided the answers, they would confirm that Lolli deleted her texts.

- Petigrow produced five non-substantive texts. He has admitted that he deleted his texts.

- Company Forwarding Counsel instructed the Company's discovery vendor to destroy the images of Grinnell and Petigrow's phones on the day of the collection.

- To assess whether texts had been deleted, the plaintiffs obtained logs from AT&T. The logs evidenced that there were some 70,000 texts (1,750 pages at forty entries per page) between and among, Mary Ellen, Lolli, Grinnell, and the other Advisors, including texts sent or received on the day before or on the day of collection.

It is reasonable to infer that if Lolli and Grinnell had preserved their texts, then the texts would show extensive communications that would bolster the allegations regarding the involvement of Lolli and Grinnell in the GRAT Domestication.

Lolli and Grinnell respond that the court cannot draw an adverse inference unless the court makes an evidence-based "finding of intentional or reckless destruction of evidence as a predicate to an adverse inference." *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 550 (Del. 2006) (reversing judgment when trial court issued spoliation

43

instruction to jury but failed to make a preliminary evidentiary finding regarding the purported document destruction). "Absent such a finding, an adverse inference . . . is not justified." *Id.* at 552. If the court were drawing an adverse inference under Court of Chancery Rule 37 that would apply for purposes of the trial on the merits, then that standard would govern. Here, the adverse inference only pertains to whether the plaintiffs have established a *prima facie* case for the exercise of personal jurisdiction at the pleading stage.

Lolli and Grinnell's argument shows that it can be confusing to refer to a pleading-stage adverse inference based on spoliation, precisely because that same phrase is used more commonly in other contexts. At this stage of the case, the court is simply engaging in the normal practice of drawing a reasonable inference based on the non-conclusory factual allegations in a verified complaint and the other evidence of record that a court can consider for purposes of a Rule 12(b)(2) motion. The inference is indeed adverse to the defendants, and it is based on spoliation of evidence, but it is only a pleading-stage inference. It is not a Rule 37 sanction that will apply for purposes of summary judgment or trial. Whether the court will draw a similar inference at later stages of the case remains to be seen.

For purposes of the Rule 12(b)(2) motion, the court will draw an adverse inference that Lolli and Grinnell participated in the GRAT Domestication to a degree where it is fair to attribute that Delaware-directed act to them for jurisdictional purposes. Lolli and Grinnell can be served under the Long-Arm Statute for purposes of Count V.

## 2. The Due Process Analysis For Purposes Of Count V

The second step in the analysis of personal jurisdiction is to determine whether its exercise would violate concepts of due process. The fourth and fifth *Istituto Bancario* elements address this aspect of the personal jurisdiction inquiry. *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

Whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy" speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there. *See Carlton Invs.*, 1995 WL 694397, at *12. "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Istituto Bancario*, 449 A.2d at 225. The "participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there." *Id.*; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

As noted, the Complaint pleads specifically that the Advisors acted in concert to engage in the GRAT Domestication by alleging that "[o]n December 24, 2018, the Advisors caused the removal of Premier Trust as the Mary Ellen GRAT trustee and installed First Republic." Compl.¶ 105. The Complaint's allegations about Grinnell and

45

Lolli's involvement in the Share Withdrawal support a similar inference. Taking those allegations as a whole, it is reasonable to infer that Grinnell and Lolli knew about the GRAT Domestication and that it would have a direct and foreseeable effect in Delaware.

As the Delaware Supreme Court explained in *Papendick v. Bosch GmbH*, a party that forms a Delaware corporation has purposely availed itself of Delaware's laws and established sufficient minimum contacts with the state to satisfy due process. 410 A.2d 148, 152 (Del. 1979). The same reasoning applies to the GRAT Domestication. It is therefore reasonable and consistent with due process to exercise jurisdiction over Lolli and Grinnell for purposes of Count V.

## B.    Personal Jurisdiction For Purposes Of Counts III and IV

In Count III, the Complaint asserts that Lolli and Grinnell breached their fiduciary duties by (i) pursuing the personal best interests of Mary Ellen and the Advisors rather than the best interests of the Company and all of its stockholders and (ii) pursuing their own best interests rather than the best interests of the Company. In Count IV, the Complaint asserts that to the extent that Lolli and Grinnell were not themselves fiduciaries, they aided and abetted those defendants who were fiduciaries in breaching their duties. After the Standing Decision, these counts have been narrowed to a direct challenge to the Outbound Merger.

The Standing Decision affects the analysis of Counts III and IV under the Long-Arm Statute. It is no longer necessary to examine the ongoing course of conduct that pre-dated and post-dated the Outbound Merger to determine whether the alleged wrongdoing bears a sufficient connection to Delaware to support personal jurisdiction. What matters is

46

whether the court can assert personal jurisdiction over Lolli and Grinnell for purposes of the challenge to the Outbound Merger. The answer to that question is yes.

### 1. A Delaware-Directed Act Attributable To Lolli And Grinnell For Purposes Of Counts III and IV

Once again, the analysis of personal jurisdiction starts with Delaware's Long-Arm Statute and the need for a Delaware-directed act. The Outbound Merger is itself a Delaware-directed act that constitutes the transaction of business in Delaware for purposes of claims relating to that act. *See Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at *4 (Del. Ch. 1989). The more important question is whether Grinnell and Lolli were sufficiently involved in the Outbound Merger such that the act can be attributed to them for jurisdictional purposes. Again, the answer is yes.

For purposes of service under Delaware's Long-Arm Statute, the conspiracy theory of jurisdiction attributes a Delaware-directed act to a defendant when a conspiracy to engage in tortious conduct existed and the defendant was a member of the conspiracy. *Istituto Bancario*, 449 A.2d at 225. The allegations of the Complaint support an inference that the Advisors engaged in a conspiracy to harm the plaintiffs by engaging in the Outbound Merger and that Lolli and Grinnell were members of the conspiracy.

Count III pleads a claim for breach of fiduciary duty against Mary Ellen and the Advisors. A claim for breach of fiduciary duty is an equitable tort. *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840 (Del. Ch. 2022). As noted, a complaint will support an inference of a conspiracy when it pleads facts supporting (i) the existence of a confederation or combination of two or more persons; (ii) that an unlawful act was done in

47

furtherance of the conspiracy; and (iii) that the conspirators caused actual damage to the plaintiff. *Allied Cap.*, 910 A.2d 1036. When a complaint alleges that fiduciaries acted in concert to commit a breach of duty, those allegations satisfy the requirements to plead a conspiracy to engage in tortious conduct involving those fiduciaries. Again, the absence of an explicit conspiracy claim is not fatal for jurisdictional purposes. *See Benerofe*, 1996 WL 535405, at *3.

Count IV pleads a claim for aiding and abetting breaches of fiduciary duty against any of the Advisors who are not found to be fiduciaries. "[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law." *Allied Cap.*, 910 A.2d at 1038; *accord Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986). Sufficiently pleading that a defendant aided and abetted a breach of fiduciary duty satisfies the need to plead a conspiracy to engage in tortious conduct involving that defendant. *Virtus Cap.*, 2015 WL 580553, at *12.

In this case, the Complaint pleads facts sufficient to support an inference that Grinnell and Lolli were part of a conspiracy to harm the plaintiffs by engaging in the Outbound Merger. When a company engages in a merger, management typically takes the lead role. Under the Royce MSA, Lolli and Grinnell were "key employees" who provided management services to the Company on behalf of Royce. Compl. ¶ 37. In return, Royce earned $2.5 million per year, plus annual bonuses. In all, Royce was paid approximately $20 million from October 2015 through December 2020. Based on Royce's role and compensation, it is reasonable to infer that Lolli and Grinnell led the effort to complete the Outbound Merger.

48

Other factual allegations in the Complaint confirm Grinnell's involvement in the conspiracy. The idea for the Outbound Merger arose after Tim Harris's Delaware counsel appeared at the Company's annual meeting in April 2019. Grinnell and Petigrow were the only Company representatives to appear at the 2019 annual meeting. *Id.* ¶ 113. Grinnell refused to identify himself. *Id.* ¶ 114. When the stockholders and their proxies tried to ask questions, Grinnell repeatedly claimed that their questions had to be in writing. *Id.* ¶¶ 114, 116, 119. After the annual meeting, Grinnell and the other Advisors anticipated a books-and-records demand and a lawsuit. Grinnell circulated a New Jersey Supreme Court decision to Lolli and Petigrow which indicated that under New Jersey law, the Company could limit a books-and-records production to formal minutes and financial statements. The Company kept no minutes, and Schwager prepared the financial statements to conceal the payments to Royce and other interested transactions. *Id.* ¶ 122. Within a week after the annual meeting, Grinnell, Lolli, and the other Advisors had started pursuing the Outbound Merger. *Id.* ¶ 123. The Company's privilege log contains entries showing that Grinnell was involved with the arrangements for the Outbound Merger, including the documentation for the merger. *Id.* ¶¶ 124, 130.

Beyond her role with Royce, the Complaint pleads fewer facts regarding Lolli and her involvement with the Outbound Merger. She was part of the discussions regarding moving the Company to New Jersey that occurred immediately after the 2019 annual meeting. *See id.* ¶ 122. And she was part of the decision to pursue the Outbound Merger. *See id.* ¶ 123.

49

At a minimum, the court would permit the plaintiffs to seek jurisdictional discovery to examine the connections between Lolli and Grinnell and the Outbound Merger. In this case, however, the evidence that Lolli and Grinnell engaged in spoliation supports an adverse inference that Lolli and Grinnell were part of a conspiracy to engage in the Outbound Merger. It is reasonable to infer that if Lolli and Grinnell had preserved their texts, then the texts would show extensive communications regarding the Outbound Merger. For purposes of the Rule 12(b)(2) motion, the court will draw an adverse inference that Lolli and Grinnell participated in the Outbound Merger to a degree where it is fair to attribute that Delaware-directed act to them for jurisdictional purposes.

### 2. The Due Process Analysis For Purposes Of Count III And IV

Once again, the second step in the analysis of personal jurisdiction is to determine whether its exercise would violate concepts of due process. The fourth and fifth *Istituto Bancario* elements come into play for Counts III and IV, just as they came into play for Count V.

Under the conspiracy theory, due process is satisfied when a defendant knew or had reason to know of the forum-directed activity and the degree to which the forum-directed activity was a direct and foreseeable result of the conduct in furtherance of the conspiracy. *See Istituto Bancario*, 449 A.2d at 225; *Carlton Invs.*, 1995 WL 694397, at *12.

The Complaint pleads facts supporting the inference that Grinnell and Lolli knew about the Outbound Merger and that it would have an effect in Delaware by eliminating the Company's separate existence as a Delaware corporation. They also believed that it would cut off the plaintiffs' ability to obtain meaningful books and records and extinguish

50

the plaintiffs' standing to pursue derivative claims. It is reasonable to assume that Lolli and Grinnell sought to use Delaware law to effectuate the Outbound Merger and thereby cut their ties to this state. Having purposefully availed themselves of the benefits of Delaware law, Lolli and Grinnell could reasonably foresee that they would be subject to suit in Delaware for claims relating to that transaction. It is fair and consistent with due process to litigate claims against them relating to the Outbound Merger in Delaware.

## C.     Personal Jurisdiction Over Royce

For purposes of the jurisdictional analysis, this decision does not separately analyze Royce. That entity is a shell company controlled by Lolli and Grinnell, who are its only principals. Because Lolli and Grinnell are the principals of Royce and act on its behalf, their acts and knowledge are imputed to Royce. *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *50 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019).

Royce is the entity through which Lolli and Grinnell provided management services to the Company, making the jurisdictional analysis of Lolli and Grinnell's acts in connection with the Outbound Merger for purposes of Counts III and IV directly applicable to Royce. Whether Lolli and Grinnell acted on behalf of Royce or in their personal capacities for purposes of the GRAT Domestication is less clear, but the court need not address that issue at this stage of the case. Some of the relationships that Lolli and Grinnell had with First Republic Bank ran through Royce, which had placed its defined benefit plans with Selcow. *See* Compl. ¶ 227. Lolli and Grinnell's jurisdictional acts for purposes of Count V are attributable to Royce as well.

51

## III.     THE RULE 12(B)(3) MOTION

Lolli, Grinnell, and Royce contend that this court is an improper venue for purposes of the claims against them because the Royce MSA contained a forum selection clause specifying the New Jersey courts as the forum for litigation between the Company and Royce. That clause is not controlling for purposes of the claims that remain at issue in this case.

In *OTK Associates, LLC v. Friedman*, this court rejected the argument that a forum selection clause in an agreement that governed a recapitalization between a company and a major investor applied to lawsuits brought by stockholders alleging that the directors breached their duties by entering into the agreement and that the counterparty had aided and abetted the fiduciary breach. 85 A.3d 696, 721 (Del. Ch. 2014). This court explained that under the internal affairs doctrine, those claims were governed by Delaware common law, not by the terms of the recapitalization agreement. *Id.* This court also held that the forum selection clause did not control because whether a third party owed fiduciary duties or aided and abetted those fiduciary duties depends upon "a set of rights and obligations that are independent of any contract," and therefore did not arise out of or relate to the contract containing the claims. *Id.* (quoting *Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 817 A.2d 149, 157 (Del. 2002)). This court noted that if the forum selection clause in a transaction agreement governed any stockholder lawsuits challenging the transaction, then "the solution to the problem of multi-forum litigation has been hiding in plain sight for decades, under the noses of the courts and corporate bar." *Id.* Because a forum selection clause in the transaction agreement does not apply to breach of fiduciary duty claims

52

challenging the transactions, practitioners developed other technologies, such as forum selection bylaws.

The same reasoning applies to the forum selection clause in the Royce MSA. There does not appear to be any case in which a Delaware court has held that a forum selection clause in a management services agreement, consulting agreement, or employment agreement encompassed direct claims for breach of fiduciary duty or for aiding and abetting a breach of fiduciary duty. If an ordinary forum selection clause encompassed those claims, then corporate planners could readily divest the Delaware courts of jurisdiction and route internal affairs cases to other states or into arbitration. As *OTK* explains, that is not the law. If corporations wish to route internal affairs claims to a particular forum, then they can adopt charter or bylaw provisions designed to achieve that result. 8 *Del. C.* § 115; *Salzberg v. Sciabacucchi*, 227 A.3d 102, 114 (Del. 2020). A provision in a contract does not do the trick.

As in *OTK*, the plaintiffs allege in Count III that Grinnell and Lolli owed fiduciary duties that exist independent of the Royce MSA. The plaintiffs have asserted a direct claim for breach of those duties in connection with the Outbound Merger, so the forum selection clause in the Royce MSA does not govern. The same is true for the aiding and abetting claim in Count IV, which is also a direct claim challenging the Outbound Merger.

A similar analysis applies to the claim in Count V for tortious interference relating to the Share Withdrawal. The duty not to tortiously interfere with the trust agreement exists independent of the Royce MSA and does not implicate it.

53

To be fair, the Complaint contains allegations that reference Royce's contractual duties under the Royce MSA. If the plaintiffs had sued derivatively on behalf of the Company for breach of the Royce MSA, then the forum selection clause would apply. The plaintiffs have disavowed any intent to assert such a claim, and as a result of the Standing Decision, no claims of that sort are at issue. The motion for dismissal under Rule 12(b)(3) is therefore denied.

## IV. CONCLUSION

This court can exercise personal jurisdiction over Lolli and Grinnell for purposes of Counts III, IV, and V and over Royce for purposes of Counts IV and V. The forum selection clause in the Royce MSA does not apply to the plaintiffs' challenges to the Outbound Merger and the Share Withdrawal. The motions for dismissal under Rules 12(b)(2) and (b)(3) are denied.